IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | | |
|---|---|---|
| CRC Scrap Metal Recycling, LLC, | ) | C.A. No. 7:12-146-HMH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Hartford Casualty Insurance Company, | ) | |
| Hartford Fire Insurance Co., and | ) | |
| Watson Insurance Agency, Inc., | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the court on Hartford Casualty Insurance Company's and Hartford

Fire Insurance Co.'s (collectively "Hartford") motion for summary judgment and Watson

Insurance Agency, Inc.'s ("Watson") motion for summary judgment pursuant to Rule 56 of the

Federal Rules of Civil Procedure. For the reasons set forth below, the court grants Hartford's

motion for summary judgment and grants Watson's motion for summary judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

CRC Scrap Metal Recycling, LLC ("CRC") is in the business of buying and selling scrap

metal including aluminum forms. (CRC Mem. Opp'n Hartford Mot. Summ. J. Ex. 4 (Stanley

Dep. at 10).) Paul Hendricks ("Hendricks"), an employee of Watson, sells commercial

insurance and solicited CRC's insurance business in 2009. (Id. Ex. 3 (Hendricks Dep. at 6, 19).)

Hendricks is an authorized licensed agent for Hartford and Hendricks had previously sold

insurance policies to other scrap metal businesses. (Id. Ex. 3 (Hendricks Dep. at 7).); (Hartford

Reply Ex. C (Hendricks Dep. at 110).) In or around June 2009, Hendricks met with Ronnie

1

Strange ("Strange"), CRC's owner, and Renee Stanley ("Stanley"), a CRC employee, to discuss CRC's insurance needs.  (Hartford Mem. Supp. Summ. J. Ex. D (Strange Dep. at 23).) Subsequently, CRC purchased an umbrella policy, policy number 22-RHV-JF1350 and Special Multi-Plex Policy Form, policy number 22-UUV-JF1326 (collectively "Policy"), with an effective date of July 10, 2009.  (Id. Ex. A (Policy).)  The Multi-Plex Policy included four separate coverages: commercial general liability ("CGL") coverage, property choice coverage, commercial auto coverage, and inland marine coverage.  (Id. Ex. A (Policy).)  At issue in the instant case is the CGL and umbrella coverage under the Policy.  It is undisputed that CRC had no direct contact with Hartford prior to purchasing the Policy and that all of CRC's direct contacts were with Watson.  (Hartford Reply Ex. E (Stanley Dep. at 38).)

In November 2010, Action Concrete Contractors, Inc. ("Action Concrete") filed suit against CRC and CRC notified Watson of the underlying lawsuit against CRC currently pending in state court, Action Concrete Contractors, Inc. v. CRC Scrap Metal Recycling, LLC, 2010-CP-42-5742 ("Action Concrete case").  On November 18, 2010, Hartford received notice from Watson.  (Hartford Mem. Supp. Summ. J. Ex. F (Lorraine Karas ("Karas") Aff. ¶ 6).)  CRC argues that in the Action Concrete case, Action Concrete "alleges that it incurred property damages including, but not limited to, the wrongful sale(s) of aluminum forms belonging to Action Concrete Contractors, Inc. and the damage/destruction of some of the aluminum forms owned by Action Concrete Contractors, Inc. by CRC."  (Am. Compl. ¶ 11.)  After review, on December 8, 2010, Hartford denied coverage under the Policy for the Action Concrete case on the basis that "there was no 'property damage' caused by an 'occurrence' as those terms are defined in the" Policy and further, the "policy exclusions in CRC's policy for 'Expected or

2

Intended Injury,' 'Damage to Your Product,' and damages to property that was in CRC's 'Care, Custody or Control,' precluded coverage." (Hartford Mem. Supp. Summ. J. 7 & Ex. F (Karas Aff. ¶¶ 11-12).) Prior to denying coverage, Hartford discussed the matter with Hendricks who agreed with Hartford's "analysis and stated that he knew that the claim was not covered, that he had already explained this to CRC, and that Hartford should go ahead and send the disclaimer and he would discuss with CRC." (Id. at 8 & Ex. F (Karas Aff. ¶ 13).) As such, Hartford has refused to defend or indemnify CRC in the Action Concrete case.

In the instant lawsuit, CRC asserts causes of action against Hartford for (1) breach of contract; (2) bad faith; (3) improper claims practice/attorney fees; (4) negligence; and (5) negligent misrepresentation for its refusal to indemnify and defend CRC in the Action Concrete case. (Am. Compl., generally.) In addition, CRC asserts claims for negligence and negligent misrepresentation against Watson. (Id.)

Watson filed a motion for summary judgment on July 13, 2012, and Hartford filed a motion for summary judgment on August 9, 2012. CRC submitted its responses in opposition to the motions on August 13, 2012, and September 10, 2012, respectively. Watson filed a reply in support of its motion on September 10, 2012, and Hartford filed a reply in support of its motion on September 20, 2012. This matter is now ripe for consideration.

## II. DISCUSSION OF THE LAW

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In deciding whether a genuine issue of material fact exists, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in his favor. See

3

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248.

A litigant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."  Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate."  Monahan v. County of Chesterfield, 95 F.3d 1263, 1265 (4th Cir. 1996).  "[T]he mere existence of *some* alleged factual dispute between parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  Ballenger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987).

### A.  Incomplete Discovery

As an initial matter, CRC alleges that the Defendants' motions for summary judgment are premature because discovery is ongoing and CRC has not yet deposed Hartford's claims adjuster, Keith Morrison, and Hartford's claims supervisor, Karas, who denied CRC's request for coverage.  (CRC Mem. Opp'n Hartford Mot. Summ. J. 10.)  CRC has provided an affidavit from its attorney, John E. Rogers, II ("Rogers"), who opines that "[a]s Morrison and Karas are the Hartford employees that made the coverage claim denial decision, Plaintiff cannot properly and fully respond to Hartford's motion for summary judgment without conducting said depositions."  (Id. Ex. 8 (Rogers Aff. ¶ 6).)  The depositions were scheduled for September 11 and 21, 2012, respectively.  Rogers further submits that once these depositions are taken,

"Plaintiff can properly and fully respond to Hartford's Motion for Summary Judgment."  (Id. Ex. 8 (Rogers Aff. ¶ 7).)  Given the date of this order, it appears that these depositions were completed weeks ago and CRC has not filed any motion requesting leave to supplement its memorandum in opposition to its motion.  Further, after review of the motions and as set forth more fully below, no genuine issues of material fact exist that would necessitate further discovery.  Therefore, the court finds that the motions are not premature.

### B. Summary Judgment Motions

Watson moves for summary judgment on the negligence and negligent misrepresentation claims because "the evidence is undisputed that Plaintiff did not request any specific policy providing coverage for the purchase of stolen goods and did not request Watson to advise as to Plaintiff's insurance needs."  (Watson Mem. Supp. Summ. J. 1.)  Hartford moves for summary judgment arguing that (1) as a matter of law, the breach of contract and bad faith claims fail because the plain language of the Policy does not provide coverage for the alleged conversion of stolen aluminum forms; and (2) the negligence or negligent misrepresentation claims fail because CRC never "sought advice from Hartford regarding its insurance needs, nor did it specifically request that coverage for the purchase of stolen property be included in the Policy[,]" and Hartford made no false representations to CRC regarding the Policy.  (Hartford Mem. Supp. Summ. J. 2-3.)

**1. Breach of Contract Claim Against Hartford**

"The general rules of contract construction apply to insurance policies." <u>S.C. Farm Bureau Mut. Ins. Co. v. Kennedy</u>, 700 S.E.2d 258, 261 (S.C. Ct. App. 2010). "The purpose of all rules of contract construction is to ascertain the intention of the parties to the contract." <u>Parker v. Bryd</u>, 420 S.E.2d 850, 852 (S.C. 1992). "[I]n construing an insurance contract, all of its provisions must be considered together. Therefore, the court must consider the entire contract between the parties to determine the meaning of its provisions . . . ." <u>Kennedy</u>, 700 S.E.2d at 261. Under South Carolina law, "[a]mbiguous or conflicting terms in an insurance policy must be construed liberally in favor of the insured and strictly against the insurer." <u>Id.</u> "However, if the intention of the parties is clear, courts have no authority to torture the meaning of the policy language to extend or defeat coverage that was never intended by the parties." <u>Id.</u>

Pursuant to the CGL Policy,[1] Hartford agreed to

> pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for . . . "property damage" to which this insurance does not apply . . . .

(Hartford Mem. Supp. Summ. J. Ex. A (CGL Policy Docket Entry 38-2 at 153).) The Policy further states that the insurance applies "to . . . 'property damage' only if: (1) The . . . 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; [and] (2) The . . . 'property damage' occurs during the policy period." (<u>Id.</u> Ex. A (CGL Policy Docket Entry 38-2 at 153).) "Occurrence" is defined as "an accident, including continuous or repeated

---

[1] The language of the umbrella Policy largely mirrors the language quoted herein and the analysis is the same. Therefore, for the sake of brevity, the court is quoting only the language of the CGL Policy.

exposure to substantially the same general harmful conditions."  (Id. Ex. A (CGL Policy Docket Entry 38-2 at 169).)

Hartford submits that "[c]onversion is not a 'property damage' caused by an 'occurrence'" because conversion is not an accident.  (Hartford Mem. Supp. Summ. J. 12.)  The Action Concrete case alleges a claim for negligence, conversion, and violation of the South Carolina Unfair Trade Practices Act ("SCUTPA").  In its original complaint, Action Concrete alleged that "CRC negligently, recklessly, willfully, and wantonly breached its duty to Action Concrete in purchasing . . . forms belonging to it despite knowing that the forms were stolen." (CRC Mem. Opp'n Mot. Dismiss Ex. 1 (Action Concrete Compl.  ¶ 11).)  Further, Action Concrete alleged that "CRC's conversion of Action Concrete's aluminum forms was a willful and intentional taking entitling Action Concrete to the highest market value of the aluminum forms with interest, including additions or improvements . . . ."  (Id. Ex. 1 (Action Concrete Compl. ¶ 16).)  Subsequently, Action Concrete filed an amended complaint removing the allegations that CRC knew that the forms were stolen.  The amended complaint alleges that "CRC negligently and recklessly breached its duty to Action Concrete in purchasing concrete forms that belonged to Action Concrete."  (CRC Mem. Opp'n Hartford Summ. J. Ex. 6 (Action Concrete Am. Compl. ¶ 10).)   Further, Action Concrete's amended claim for conversion alleges, "CRC's conversion of Action Concrete's aluminum forms was reckless and with conscious indifference to Action Concrete's property rights . . . ."  (Id. Ex. 6 (Action Concrete Am. Compl. ¶ 17).)

CRC submits that "at the very least, the underlying Complaint filed by Action Concrete creates a possibility of coverage under the Hartford CGL and umbrella insurance policies issued

to CRC, and a possibility of coverage triggers an insurer's obligation to defend."  (CRC Mem. Opp'n Hartford Mot. Summ. J. 21.)

"[A]n insurer's duty to defend is not strictly controlled by the allegations in [the] Complaint.  Instead, the duty to defend may also be determined by facts outside of the complaint that are known by the insurer."  USAA Property and Cas. Ins. Co. v. Clegg, 661 S.E.2d 791, 798 (S.C. 2008).  CRC submits that it did not know that the forms were stolen and that this position is further supported by the testimony of Action Concrete's Rule 30(b)(6) witness who testified that she did not know whether CRC knew that the forms were stolen.  (CRC Mem. Opp'n Hartford Mot. Summ. J. 16-18.)

> Conversion is the unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of the condition or the exclusion of the owner's rights.  Conversion may arise by some illegal use or misuse, or by illegal detention of another's personal property.  Conversion is a wrongful act which emanates by either a wrongful taking or wrongful detention.

Hawkins v. City of Greenville, 594 S.E.2d 557, 566 (S.C. Ct. App. 2004) (internal quotation marks and citations omitted).  Intentional conversion is clearly not an accident and therefore, is not an occurrence under the Policy.  The issue for the court to determine is whether a negligent or innocent conversion qualifies as an occurrence under the Policy. [2]

To the extent the Action Concrete case alleges negligent or innocent conversion, the court finds that it does not qualify as an occurrence under the Policy because negligent or

---

[2] Hartford disputes whether a cause of action for negligent or innocent conversion exists under South Carolina law.  (Hartford Reply 3.)  Research revealed no South Carolina cases addressing this issue.  However, for purposes of this motion, it is unnecessary for the court to determine whether South Carolina law supports a cause of action for innocent or negligent conversion.  Further, the Action Concrete case alleges a claim for negligence.

innocent conversion is not an accident. Adams v. Unione Mediterranea Di Sicurta, 220 F.3d

659, 678 (5th Cir. 2000) (finding that negligent conversion "was not an accident or a fortuitous

event"). Even if CRC did not know that the forms were stolen, CRC intentionally purchased the

forms and then intentionally sold the forms. Research did not reveal any South Carolina state

court cases addressing this issue. However, other courts considering this issue have reached the

same conclusion and the court finds the logic of those cases persuasive. In Adams, the Fifth

Circuit noted that

> [a]s a salvor, American Eagle had the right to possess the steel and the duty to
> either return the steel to the Plaintiffs or file a salvage lien to obtain compensation.
> American Eagle did not do that. Instead, American Eagle intentionally transferred
> possession of the steel to A.K. Steel, who subsequently consumed the steel. This
> transfer, purchase and consumption negligently interfered with the Plaintiffs'
> ownership of the steel. Therefore, American Eagle and A.K. Steel committed
> negligent conversion.

Id. at 678. The court held that

> [t]his act was not an accident or a fortuitous event. American Eagle's and A.K.
> Steel's interference constituted more than an accidental or unexpected event. A
> reasonable person would not transfer, purchase and consume the steel without
> regard for the true owner's interest. Given the facts of this case, we conclude that
> American Eagle's and A.K. Steel's negligent conversion was not an accident, and
> thus is not covered by Britamco's insurance policy.

Id. In Red Ball Leasing, Inc. v. Hartford Accident and Indemnity Co., the Seventh Circuit

concluded that there was no occurrence under the policy at issue in a case where a company

repossessed certain vehicles in error. 915 F.2d 306, 309 (7th Cir. 1990). The court noted that

> [t]here is no doubt that Red Ball intended to repossess the trucks; that action
> clearly was not an accident. However, Red Ball asserts that the conversion was
> accidental, because Red Ball believed that it had a right to repossess the trucks.
> This argument relies on a reading of the policy that would allow coverage when
> the insured volitionally commits an act, but the decision to commit the act is based
> on erroneous or mistaken information.

9

Id. Further, the Seventh Circuit explained that

> [a] volitional act does not become an accident simply because the insured's
> negligence prompted the act.  Injury that is caused directly by negligence must be
> distinguished from injury that is caused by a deliberate and contemplated act
> initiated at least in part by the actor's negligence at some earlier point.  The former
> injury may be an accident.

Id. at 311.  Thus, "the decision to take the trucks–an intentional act of Red Ball–is not an

'accident' under the terms of the insurance policy.  Therefore, we conclude that the injury was

not covered by the property damage provision of the insurance contract."  Id.

Numerous other cases are in line with the Fifth and Seventh Circuit's decisions.  See

e.g., Simmons Refining Co. v. Royal-Globe Ins. Co., 543 F.2d 1195, 1197-98 (7th Cir. 1976)

(receiving stolen gold without knowledge of theft is not an "occurrence"); Thomason v. United

States Fidelity & Guar. Co., 248 F.2d 417, 419 (5th Cir. 1957) (bulldozer straying onto

adjoining land by mistake was not an "accident" for purposes of insurance coverage that referred

only to accidents and not "occurrences," because the act was voluntary and intentional); Deseret

Fed. Sav. and Loan Ass'n v. United States Fidelity & Guar. Co., 714 P.2d 1143, 1146 (Utah

1986) (injury caused by an intentional act, constructive eviction, was not "unexpected and

unintended damages" covered by the policy); Harrison Plumbing & Heating, Inc. v. New

Hampshire Ins. Group, 681 P.2d 875, 878 (Wash. Ct. App. 1984) ("An accident is never present

when a deliberate act is performed unless some additional unexpected, independent and

10

unforeseen happening occurs which produces the damage.")[3]  Based on the foregoing, the

claims in the Action Concrete case do not constitute an occurrence under the Policy. [4]

In addition, CRC argues that Hartford's motion on the breach of contract claim should be

denied because the July 2010 renewal of the Hartford policy included a scrap metal exclusion,

the very business CRC operates.  (CRC Mem. Opp'n Hartford Mot. Summ. J. 22.)  The Action

Concrete complaint alleges that Lee Gregory ("Gregory") "and potentially others" stole

aluminum forms in 2009 and 2010.  (Id. Ex. 6 (Action Concrete Am. Compl. ¶ 5).)  CRC's

records reflect that Hartford purchased 77,380 pounds of aluminum for $26,784 from Gregory

from August 2009 through January 2010.  (Hartford Reply 10 & Ex. A (Blake Stanley Dep. at

27, 37-38).)  Thus, Hartford submits that the pertinent policy period at issue in this case is the

July 2009-July 2010 period.  Upon renewal in July 2010, a scrap metal exclusion was included

in the Property Choice coverage part of the Policy by Hartford, not the CGL and umbrella

_____

[3] There are other cases that find that actions taken without knowledge were occurrences because there was no intent to cause injury.  See Vermont v. Glens Falls Ins. Co., 404 A.2d 101, 104-05 (Vt. 1979) (holding that a charge of conversion against a sheriff for seizing the wrong property was an "occurrence" because the sheriff did not intend to cause injury); N.W. Elec. Power Coop., Inc. v. American Motorists Ins. Co., 451 S.W.2d 356, 362-64 (Mo. Ct. App. 1969) (damage to land caused by placement of power line outside of easement was an "accident" because the injury was not inflicted intentionally).  However, the court finds the reasoning in these cases unpersuasive.

[4] CRC does not address in its memorandum Action Concrete's claim that CRC violated SCUTPA when it "purchas[ed] materials that were stolen, and were the rightful property of someone other than the seller."  (CRC Mem. Opp'n Hartford Mot. Summ. J. Ex. 6 (Action Concrete Am. Compl. ¶ 21).)  However, a violation of SCUTPA requires more than negligence.  Clarkson v. Orkin Exterminating Co., 761 F.2d 189, 191 (4th Cir. 1985) (finding that under SCUTPA one "need not show intentional deception, but a plaintiff cannot prevail without showing at least a potential of deception").  Further, for the reasons discussed herein, Action Concrete's SCUTPA claim does not qualify as an "occurrence" under the Policy.

coverage at issue in the case at bar.  (Id. 10 & Ex. C (Hendricks Dep. at 47, 52, 108).)  CRC

notes that "'scrap' was not excluded from [the] subject policy when purchased by CRC, and

when it was allegedly included in the renewal policy, CRC was not informed of said addition."

(CRC Mem. Opp'n Hartford Mot. Summ. J. 12.)  CRC cites Isle of Palms Pest Control Co. v.

Monticello Insurance Co., 459 S.E.2d 318 (S.C. Ct. App. 1994), in support of its position.  In

Monticello, the insurer argued in part that coverage for the alleged negligent preparation of a

termite inspection report was precluded under the policy by the professional liability exclusion.

Id. at 320-21.  The South Carolina Court of Appeals concluded as follows:

> Isle of Palms purchased a liability insurance policy to protect itself against claims
> for damage to property of others caused by its negligence.  The declarations page
> of the policy included "exterminator" in the list of covered general liability
> hazards, and the premium was based primarily on Isle of Palms' receipts from its
> exterminating business.  To give effect to the professional liability exclusion
> would render the policy virtually meaningless, because it would exclude coverage
> for all claims arising from Isle of Palms' exterminating services, the very risk
> contemplated by the parties.

Id. at 321.  The court concluded that ["t]he internal inconsistency created by an exclusion which

purports to bar coverage for claims arising out of the very operation sought to be insured renders

the policy ambiguous, and we must resolve that ambiguity in favor of coverage."  Id. at 19.  This

case is inapplicable to the case at bar.  Hartford denied CRC's claim for coverage on the basis

that there was no "property damage caused by an occurrence" under the Policy and that certain

exclusions in the Policy barred coverage.  (Hartford Mem. Supp. Summ. J. Ex. F (Karas Aff.

¶ 11).)  Hartford did not deny coverage on the basis of the scrap metal exclusion.  The scrap

metal exclusion, which was not in the Policy during the time period in question, is not relevant

to the court's analysis of Hartford's breach of contract.  There is no claim that Hartford breached

the contract because it has refused to provide coverage and indemnification based on the scrap

metal exclusion.  Thus, the court finds that this argument is not a separate basis to support

CRC's breach of contract claim.  Therefore, the court grants Hartford's motion for summary

judgment on the breach of contract claim.[5]

### 2. Bad Faith

Hartford moves for summary judgment on the bad faith claim because there can be no

bad faith if there is no coverage under the Policy.  Generally an insurer has a duty of good faith

and fair dealing in the performance of all obligations it undertakes to perform for the insured.

The elements of an action for bad faith under an insurance contract include:  "(1) the existence

of a mutually binding contract of insurance between the plaintiff and the defendant; (2) refusal

by the insurer to pay benefits due under the contract; (3) resulting from the insurer's bad faith or

unreasonable action in breach of an implied covenant of good faith and fair dealing arising on

the contract; (4) causing damage to the insured."  Crossley v. State Farm Mut. Auto. Ins. Co.,

415 S.E.2d 393, 396-97 (S.C. 1992).  "An insured may recover damages for a bad faith denial of

coverage if he or she proves there was no reasonable basis to support the insurer's decision to

deny benefits under a mutually binding insurance contract."  Dowling v. Home Buyers Warranty

Corp., 400 S.E.2d 143, 144 (S.C. 1991).  Hartford argues that the bad faith claim must be

dismissed because its "disclaimer of any duty to defend or indemnify the Plaintiff was properly

based upon the clear and unambiguous terms, conditions and exclusions contained in the

Policies."  (Hartford Mem. Supp. Summ. J. 19.)  As set forth above, the Policy does not provide

---

[5] Having found that the claims alleged in the Action Concrete case do not qualify as an occurrence under the Policy, the court declines to address Hartford's arguments that certain other Policy exclusions preclude coverage under the Policy.

coverage for the Action Concrete case. Thus, no action for bad faith exists. <u>Cock-n-Bull Steak House v. Generali Ins. Co.</u>, 466 S.E.2d 727, 730 (S.C. 1996). Therefore, Hartford is entitled to summary judgment on this claim.

### 3. Improper Claims Practices

S.C. Code Ann. § 38-59-40(1) provides that

> [i]n the event of a claim, loss, or damage which is covered by a policy of insurance or a contract of a nonprofit hospital service plan or a medical service corporation and the refusal of the insurer, plan, or corporation to pay the claim within ninety days after a demand has been made by the holder of the policy or contract and a finding on suit of the contract made by the trial judge that the refusal was without reasonable cause or in bad faith, the insurer, plan, or corporation is liable to pay the holder, in addition to any sum or any amount otherwise recoverable, all reasonable attorneys' fees for the prosecution of the case against the insurer, plan, or corporation.

Having already found that Hartford did not act in bad faith or unreasonably in denying coverage of the claim under the Policy, the court finds that Hartford is not liable for improper claims practices.

### 4. Negligence

Hartford and Watson move for summary judgment on CRC's negligence claim. To prevail on a negligence claim in South Carolina, "a plaintiff must show the (1) defendant owed a duty of care to the plaintiff[;] (2) defendant breached the duty by a negligent act or omission[;] (3) defendant's breach was the actual and proximate cause of the plaintiff's injury[;] and (4) the plaintiff suffered injury or damages." <u>Jackson v. Swordfish Inv., L.L.C.</u>, 620 S.E.2d 54, 56 (S.C. 2005). "Whether the law recognizes a particular duty is an issue of law to be determined by the court." <u>Id.</u> "Generally, an insurer and its agents owe no duty to advise an insured. If the agent, nevertheless, undertakes to advise the insured, he must exercise due care in giving

14

advice." Trotter v. State Farm Mut. Auto. Ins. Co., 377 S.E.2d 343, 347 (S.C. Ct. App. 1988)

(internal citations omitted). An insurer may assume a duty to advise the insured by an express

undertaking or an implied undertaking. Id. The insured bears the burden of proving the

undertaking. Id.

> An implied undertaking may be shown if: (1) the agent received consideration
> beyond a mere payment of the premium; (2) the insured made a clear request for
> advice; or (3) there is a course of dealing over an extended period of time which
> would put an objectively reasonable insurance agent on notice that his advice is
> being sought and relied on.

Id. (citations omitted). Further, an insurer can be found liable if its agent failed to exercise due

care in procuring the insurance coverage requested by the insured. Sullivan Co. v. New Swirl,

Inc., 437 S.E.2d 30, 31 (S.C. 1993); Kelly v. S.C. Farm Bureau Mut. Ins. Co., 450 S.E.2d 59, 62

n.1 (S.C. Ct. App. 1994). "A request for 'full coverage,' 'the best policy,' or similar

expressions does not place an insurance agent under a duty to determine the insured's full

insurance needs, to advise the insured about coverage, or to use his discretion and expertise to

determine what coverage the insured should purchase." Trotter, 377 S.E.2d at 347-48 (S.C. Ct.

App. 1988). Further, "an allegation that a conversation occurred [concerning adequacy of

coverage] is different in form and effect from a clear interrogatory to an insurance agent

sufficient to trigger an implied duty." Mullen v. State Farm Cas. and Fire Co., C/A No.

09-2392-JFA, 2010 WL 2228369, at *2 (D.S.C. Jun. 1, 2010) (where complaint alleged a

conversation the plaintiff had with agent "regarding the adequacy of coverage to rebuild his

home in the event of fire") (unpublished).

There is no evidence that additional consideration was paid or of any prior course of

dealing between CRC and Watson. Prior to purchasing the Policy, CRC had never purchased

insurance from or had any contacts with Watson. (Hartford Mem. Supp. Summ. J. Ex. C (Hendricks Dep. at 19-20).) However, CRC alleges that Watson and Hartford assumed a duty to advise because "Hendricks solicited the business of CRC, CRC requested an insurance policy that would provide full coverage for CRC's scrap business and CRC relied on Hendricks' representation that the Hartford Policy recommended by Hendricks would provided CRC the best coverage to cover CRC's scrap metal business." (CRC Mem. Opp'n Hartford Mot. Summ. J. 29.) In contrast, Watson and Hartford allege that CRC never requested advice and that there is no evidence that Watson, Hartford, or any of its agents[6] "expressly undertook to advise

_____

[6] Hartford disputes whether Hendricks was an agent of Hartford alleging that "the evidence incontrovertibly shows that Watson solicited the business of CRC as an independent broker." (Hartford Mem. Supp. Summ. J. 19.) However, in light of the court's rulings as set forth herein, it is unnecessary for the court to consider this issue. Further, the court notes that the issue of agency and independent insurance agents is far from clear in this case.

> A broker is ordinarily one who acts as a middleman between the insured and insurer and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a company selected by the insured or with a company selected by the broker himself.
> A broker is ordinarily employed by a person seeking insurance, and when so employed is to be distinguished from the ordinary insurance agent who is employed by an insurance company to solicit and write insurance in the company.
> Where one has no agency license with the insurer, and is requested to place the business, he is a broker.
> Whether a broker represents the insurer or the insured depends upon the facts in each case. Generally, an insurance broker is the agent of the insured, and not the insurer. The mere fact that he receives a commission from the insurer for placing the insurance does not change his character as an agent of the insured . . . .
> [T]he insurance broker is primarily the agent of the person first employing him, and[,] thus[,] where he is employed to procure insurance, he is the agent of the insured . . . . As a general rule a broker acting for the insured has no authority to bind the insurer.

16

Plaintiff regarding its insurance needs." (Watson Mem. Supp. Summ. J. 7.) Strange testified at his deposition that "[Hendricks] came to me, I told him [Hendricks] I wanted to make sure I was covered, don't leave no stones overturned; didn't ask no prices. He [Hendricks] gave us a price, but I did not - - you know, I thought everything was taken care of. That's all - -." (CRC Mem. Opp'n Hartford Mot. Summ. J. Ex. 5 (Strange Dep. at 21).) Further, Strange testified that he asked Hendricks to advise him on the appropriate policy for CRC and when asked whether he asked Hendricks if the Policy was "the appropriate insurance policy to purchase," he testified that "I'm sure - - yes, sir, I would think he did." (Id. Ex. 5 (Strange Dep. at 68).) In addition, Stanley, who was present at the meeting with Hendricks testified at her deposition, that "we told them we wanted full coverage. He [Hendricks] came in and told us that he wrote for scrap metal dealers, scrap metal yards. That's - - that was his - - what he wrote for." (Id. Ex. 4 (Stanley Dep. at 9).) Hendricks testified at his deposition that CRC asked for the "best and broadest insurance policy" and that in his opinion he sold CRC the "best coverage that [he] had available." (Id. Ex. 3 (Hendricks Dep. at 43).) A review of the evidence in this case reveals that

---

Allstate Ins. Co. v. Smoak,182 S.E.2d 749, 754 (S.C. 1971) (internal citations omitted). "However, [t]he terms agent and broker are not mutually exclusive. Under certain circumstances, a broker may be an agent for an insurance company." Holmes v. McKay, 513 S.E.2d 851, 855 (S.C. Ct. App. 1999). "[G]enerally an independent insurance agent is considered the agent of the insured. But, for some purposes[,] an independent agent is the insurance company's agent and not insured's agent or broker, when the company is one of the agent's licensed companies." Id. at 855-56. In Holmes, the South Carolina Court of Appeals held that "independent insurance agents' licenses with several insurers are, with respect to policies issued on the agents' efforts, evidence of agency with and authority to speak for the insurers for which they are licensed." Id. at 856.

neither Strange nor Stanley made a specific request for advice from Hendricks.  It is undisputed

that CRC never requested advice regarding coverage for conversion.  (Hartford Mem. Supp.

Summ. J. Ex. E (Stanley Dep. at 14-16).); (Hartford Reply Ex. D (Strange Dep. at 23).)  In

contrast, CRC made a general request for the best, broadest, or full coverage.  Generalized

requests for the best, broadest, or full coverage fail to place a duty on Hendricks to advise CRC

on coverage.  See Trotter, 377 S.E.2d at 347-48.  Further, "[c]overage cannot be imposed after

the fact simply because the insured claims, in retrospect, that he should have been sold a

different policy."  Id. at 351.  The court found on rehearing that "[a] request for 'full protection'

does not place an insurance agent under a duty to advise the insured about coverage or to use his

discretion and expertise to determine what coverage the insured should purchase."  Id. at 352.

Based on the foregoing, CRC has failed to raise any genuine issue of material fact that it made a

specific request for coverage advice or that Hendricks undertook to advise CRC .

　　　　CRC further argues that "an additional question of fact exists concerning whether or not

Hartford or its agent ever informed CRC of the 'scrap' exclusion."  (CRC Mem. Opp'n Hartford

Mot. Summ. J. 30.)  CRC submits that

>　　　　[i]f the subject policy does not cover CRC for the alleged negligent purchasing of
>　　　　stolen scrap metal (a regular occurrence in the scrap metal business even when the
>　　　　company is careful in making its scrap metal purchases) that is then sold by CRC
>　　　　and damaged by a third party recycling company (as alleged in the underlying
>　　　　lawsuit), then Hartford's agent sold CRC an insurance policy with inadequate
>　　　　coverage.

(Id. at 31.)  In addition, CRC submits that Watson did not provide the "best policy" because

Hendricks did not inform CRC of the availability of a "conversion coverage endorsement."  (Id.)

However, as discussed above, CRC never specifically requested that Hendricks advise them on

specific coverage issues beyond generalized requests for coverage in order to trigger a duty to advise. Further, when Hendricks discussed the Policy with Strange and Stanley in June 2009, the "scrap" metal exclusion was not in the Policy and Hendricks was unaware of any "conversion coverage" policy endorsement that would have covered CRC. Notably, at the time Hendricks sold the Policy to CRC none of the insurers with which he was licensed offered conversion coverage. (Id. Ex. 3 (Hendricks Dep. at 29-30, 32).) Based on the foregoing, Watson and Hartford are entitled to summary judgment on this claim.

### 5. Negligent Misrepresentation

Watson and Hartford move for summary judgment on CRC's negligent misrepresentation claim. The elements of a claim for negligent misrepresentation are:

> (1) the defendant made a false representation to the plaintiff; (2) the defendant had a pecuniary interest in making the statement; (3) the defendant owed a duty of care to see that he communicated truthful information to the plaintiff; (4) the defendant breached that duty by failing to exercise due care; (5) the plaintiff justifiably relied on the representation; and (6) the plaintiff suffered a pecuniary loss as the proximate result of his reliance upon the representation.

deBondt v. Carlton Motorcars, Inc., 536 S.E.2d 399, 405 (S.C. Ct. App. 2000). A negligent misrepresentation claim cannot be based on "unfulfilled promises or statements as to future events." Tom Hughes Marine, Inc. v. Am. Honda Motor Co., 219 F.3d 321, 324-25 (4th Cir. 2000). An exception to this general rule "exists only when a person makes a promise having at the time no intention of keeping [the] agreement." Id. at 325 (internal quotation marks omitted). Claims for negligent misrepresentation are commonly alleged against insurers based on misrepresentations by agents or employees. Rickborn v. Liberty Life Ins. Co., 468 S.E.2d 292,

19

299 (S.C. 1996) (finding insurer liable for negligent misrepresentations by employee); <u>Kelly</u>,

450 S.E.2d at 62.

> There is no liability for casual statements, representations as to matters of law, or matters which plaintiff could ascertain on his own in the exercise of due diligence. [W]hile issues of reliance are ordinarily resolved by the finder of fact, 'there can be no reasonable reliance on a misstatement if the plaintiff knows the truth of the matter. Thus, if the undisputed evidence clearly shows the party asserting reliance has knowledge of the truth of the matter, there is no genuine issue of material fact. A determination of justifiable reliance involves the evaluation of the totality of the circumstances, which includes the positions and relations of the parties.

<u>Quail Hill, LLC v. County of Richland</u>, 692 S.E.2d 499, 508 (S.C. 2010) (internal citations and

quotation marks omitted). Hartford contends that "CRC does not – and cannot – point to a

single statement by Hendricks that is allegedly false." (Hartford Reply 9.) Likewise, Watson

alleges that there is no evidence of any false representation. (Watson Mem. Supp. Summ. J. 9.)

CRC submits that it "requested the best policy available to cover CRC's scrap metal

business" and "requested that Hartford's agent advise CRC as to the proper coverage to

purchase for CRC's business." (CRC Mem. Opp'n Hartford Mot. Summ. J. 33.) CRC argues

that Hendricks advised that the Policy was the "best and proper coverage for CRC's business"

and that CRC acted upon this advice. (<u>Id.</u>) Therefore, CRC alleges that if the Policy "does not

provide coverage to CRC for the claims made against CRC in the lawsuit," then Hendricks

made "negligently false statement[s]." (<u>Id.</u>) Further, CRC contends that Hendricks'

representations of the best, full, or broadest coverage were false because he failed to advise CRC

of the "scrap" exclusion and the availability of the "conversion coverage policy endorsement,"

which Hendricks learned about in October 2010. (<u>Id.</u>); (Hartford Mem. Supp. Summ. J. Ex. C

(Hendricks Dep. at 29).)

CRC's argument in support of its negligent misrepresentation claim is devoid of any evidence that Hendricks made any false representations regarding the coverage afforded under the Policy. Hendricks' vague representation to CRC that the Policy provided the best and broadest coverage is not evidence of a false statement. (Id. Ex. 3 (Hendricks Dep. at 43).) As the Fourth Circuit noted in Lewis v. Trustmark Insurance Co.,

> [s]tatements of a vague and general character cannot be read to make representations of a specific character. Otherwise, claims such as [plaintiff's] would render actionable a host of general positive statements about product quality. The terms "full" and "comprehensive" are vague, general terms that cannot be construed to make specific representations about the coverage of a particular form of experimental treatment.

No. 98-2493, 1999 WL 486665 , at *5 (4th Cir. July 12, 1999) (granting summary judgment on fraudulent inducement claim where plaintiff argued that her employer informed her that "if she became an employee of CSI, she would be provided full and comprehensive coverage for medical treatment for her breast cancer") (unpublished); See, e.g., Miller v. PremierCorp., 608 F.2d 973, 981 (4th Cir. 1979) ("[A]n unspecific and false statement of opinion such as occurs in puffing generally cannot constitute fraud.").

Further, there is no evidence that Hendricks undertook to advise CRC about the Policy at any time after it was sold. In addition, CRC contends that "by failing to advise CRC of the 'scrap' exclusion and failing to advise CRC of the 'conversion coverage policy endorsement' available to CRC, Hendricks' representation(s) were false as subject policy does not cover CRC's scrap metal business in a prudent and proper manner." (Id.) Hendricks' statement that the Policy was the best and broadest coverage was made before he learned of the availability of conversion coverage that was offered through another carrier with which Hendricks was not

licensed at the time the Policy was sold to CRC.  (Hartford Mem. Supp. Summ. J. Ex. C

(Hendricks Dep. at 29, 32).)  The scrap metal exclusion argument is irrelevant because it was

not in the Policy when Hendricks made the representation.  Moreover, the failure to advise is not

a representation, much less a false representation.  After review of the complaint and the

applicable law, the court finds that Hartford and Watson are entitled to summary judgment on

the negligent misrepresentation claim.[7]

It is therefore

**ORDERED** that Hartford's motion for summary judgment, docket number 38, is

granted.  It is further

**ORDERED** that Watson's motion for summary judgment, docket number 34, is granted.

**IT IS SO ORDERED.**


s/Henry M. Herlong, Jr.
Senior United States District Judge

Greenville, South Carolina
October 15, 2012

---

[7] Hartford moves for summary judgment on CRC's claim for violation of SCUTPA.
However, CRC has not alleged a claim for violation of SCUTPA in its amended complaint.